IN THE MATTER OF THE APPLICATION OF NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, FOR AUTHORITY TO DISCONTINUE THE OPERATION OF ALL PASSENGER TRAIN SERVICE.

Argued October 14, 1957—Decided November 25, 1957.

*Mr. Leon Leighton,* of the New York Bar, argued the cause for appellant (*Messrs. Lum, Fairlie & Foster,* attorneys; *Mr. Leon Leighton,* of the New York Bar, on the brief).

*Mr. Howard T. Rosen* argued the cause for respondent Board of Public Utility Commissioners, etc. (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. Howard T. Rosen,* Deputy Attorney-General, of counsel and on the brief).

*Mr. Guy W. Calissi,* attorney for intervenors, Borough of Paramus and Township of Saddle Brook (*Mr. Charles L. Bertini,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. Appellant railroad applied to the Board of Public Utility Commissioners for permission to discontinue all passenger train service and later amended its application to one for curtailment of service. Following protracted hearings, there was adopted Senate Concurrent Resolution No. 20 "declaring the policy of the Legislature against further abandonment or curtailment of passenger rail service pending the final report of the Metropolitan Rapid Transit Commission." The Board made its Decision and Order suspending "all further proceedings on the application before it until the submission of the final report of the Metropolitan Rapid Transit Commission * * * and holds the proceeding open so that thereafter the parties to the proceeding may offer such further evidence as they may then deem necessary."

The Appellate Division granted leave to appeal. We certified the pending appeal on our own motion. The railroad seeks a remand to the Board with direction to determine the application on the merits.

In 1952, the New Jersey Regional Planning Commission recommended a comprehensive study to determine the most effective action toward improving rapid transportation for the metropolitan region of New York and New Jersey. New Jersey thereupon created a Metropolitan Rapid Transit Commission (*L.* 1952, *c.* 194; *N. J. S. A.* 32:22–1 *et seq.*) with authority to act jointly with a like commission created by New York (*L.* 1952, *c.* 453). A joint report was submitted on March 3, 1954. In 1954, by concurrent action of both states, the commissions were consolidated into a temporary bi-state commission (*L.* 1954, *c.* 44; *N. J. S. A.* 32:22–11 *et seq.; N. Y. L.* 1954, *c.* 801). Furnished with $1,800,000, the bi-state commission undertook a comprehensive study through a project director whose report and

recommendations were submitted to it on May 20, 1957. Hearings thereon have been held and the final report of the commission is expected by December 31, 1957. The Concurrent Resolution was filed on April 3, 1957, in advance of the report of the project director, and the Decision and Order here under review was made after that report, to wit, on July 3, 1957.

The Concurrent Resolution reads in part:

"WHEREAS, There have been repeated applications by railroads serving North Jersey commuters and others to abandon or seriously curtail passenger service and such applications are presently pending before the Board of Public Utility Commissioners; and

WHEREAS, Periodic applications for abandonment or curtailment of rail service cause the commuters and the public generally as well as the officials of the counties and communities affected grave concern for necessary transportation and the expenditure of considerable sums of money, time and effort in opposing such repeated applications; and

WHEREAS, Any further abandonment or curtailment of passenger rail service may well interfere with any proposals for an over-all solution of the North Jersey-New York City transportation problems to be advanced by the Metropolitan Rapid Transit Commission; now, therefore,

BE IT RESOLVED *by the Senate of the State of New Jersey (the General Assembly concurring)*:

1. That the public interest of the State requires that there be no further abandonment or curtailment of passenger rail service in New Jersey pending the presentation of the final report of the New York-New Jersey Metropolitan Rapid Transit Commission to the Governors and Legislatures of New York and New Jersey.

2. That the foregoing shall be the declared policy of the Legislature of New Jersey for the guidance of all State departments concerned with applications for abandonment or curtailment of rail service as aforesaid.

3. This concurrent resolution shall take effect immediately."

## I.

Although the railroad agrees that the merits of its application are not before us for decision, yet the bulk of its attack appears to involve the premise that it ultimately must prevail and hence delay in the final determination offends constitutional principles. We, of course, will not

pass upon the merits of the pending application before the Board, but rather will limit our consideration to the question whether the Concurrent Resolution or the Board's response to it justified the Decision and Order under appeal. Indeed, the relief the railroad expressly seeks, to wit, that the matter be remanded to the Board to be determined on its merits, fairly involves no broader question.

We are not concerned with whether the Legislature may declare a moratorium upon proceedings before the Board in this area. It is perfectly clear the Concurrent Resolution is not an act of legislation. *Article IV, Section IV, paragraph 6,* of the *Constitution of* 1947 prescribes the procedure for the passage of "bills and joint resolutions." The Constitution is silent with respect to concurrent resolutions, and as well with respect to the effect of a joint resolution. In practice, the Legislature adopts resolutions of both types, sending only joint resolutions to the Governor for his consideration pursuant to statutes enacted both before and since the Constitution of 1947. *R. S.* 1:2–5; *N. J. S. A.* 1:2–3.1. The Executive Article refers only to bills in fixing the procedure for final executive action. We need not consider the operative effect of a joint resolution when approved by the Governor. The resolution here involved is a concurrent one, and of course was never submitted to the Governor for his action. Except within the precincts of the Legislature, or perhaps where it acquires force by virtue of some specific statute, a concurrent resolution is ordinarily an expression of sentiment or opinion, without legislative quality of any coercive or operative effect. See generally 2 *Sutherland, Statutory Construction* (3d ed. 1943), § 3801 *et seq.;* 50 *Am. Jur., Statutes,* § 4, *p.* 16; 82 *C. J. S. Statutes* § 1, *p.* 19 and § 20, *p.* 47; Ginnane, "The Control of Federal Administration by Congressional Resolutions and Committees," 66 *Harv. L. Rev.* 569 (1953); Gibson, "Congressional Concurrent Resolutions: An Aid To Statutory Interpretation?," 37 *A. B. A. J.* 421 (1951); Myers, "Joint Resolutions Are Laws," 28 *A. B. A. J.* 33 (1942); 22 *Cornell L. Q.* 90 (1936); and see *In re Hague,* 104 *N. J. Eq.*

31, 63–64 (*Ch.* 1929), affirmed by an equally divided court, 104 *N. J. Eq.* 369 (*E. & A.* 1929).

Although in its brief the Board alludes to the historical fact that its functions were once performed by the Legislature itself, citing *West Jersey and Seashore Railroad Co. v. Board of Public Utility Commissioners,* 87 *N. J. L.* 170, 176–177 (*E. & A.* 1915), and notes that the Board's actions are generally regarded as legislative in nature, citing *In re New Jersey Power & Light Co.,* 9 *N. J.* 498, 508 (1952), and by those references seems to intimate that it should properly be responsive to the legislative wish even though expressed by a concurrent resolution, yet upon the oral argument before us it contended that it did not deem itself constrained to postpone a determination but rather concluded the postponement to be warranted by the public interest in the light of all of the facts before it. It adds that its action should be equated to a judge's grant of postponement and should be disturbed only for a misuse of discretion.

The difficulty with the Board's position is that its Decision and Order does not reveal the exercise of discretion. There are no findings to support a conclusion that the merits of the application should not or can not fairly be determined without consideration of the impact of the final report of the Metropolitan Rapid Transit Commission upon public necessity and convenience. On the contrary, the Decision and Order indicates the Board examined the Concurrent Resolution to ascertain the legislative will, and upon finding it, ordered the postponement without more.

The Decision and Order states the resolution "has not the binding effect of a statute. However, this Concurrent Resolution is a formal declaration of policy as to a matter which is within the province of the legislative branch." The thought is expanded by saying the Board exercises "delegated authority that is legislative in nature" and "Because of these considerations, the Board ought not to disregard the formal declaration of policy made by the Concurrent Resolution. The Board must determine the intent of the legislature in adopting the Resolution. * * * The intent of the Resolu-

tion, read in the light of the preamble, is clear. The policy declared is, that, in order to avoid any possible interference with any proposals that the Rapid Transit Commission may submit for the over-all solving of the problem, there shall be no further abolition or curtailment of passenger rail service until the final report of that Commission is submitted. * * * The reference in the preamble of the resolution to 'applications * * * presently pending before the Board of Public Utility Commissioners * * *' makes it clear that the declaration of the policy of the Legislature was intended to apply to applications pending before this Board at the time of the resolution." With respect to the railroad's contention that the resolution was inapplicable because no tracks are to be taken up or changed, the Board replied that it could not accept a construction of the legislative expression which would exempt that situation from its orbit.

■ Thus it is plain the Board did not exercise its discretion on the basis of its appraisal of the possible impact of the Rapid Transit Commission's report in the light of the facts of this matter; on the contrary, it did not exercise its discretion at all, but rather deemed itself obliged to yield to the legislative wish or opinion. It need hardly be added that at least in the absence of a statute validly so providing the Legislature may not by concurrent resolution control the exercise of a *quasi*-judicial function of an administrative agency, and it is of no moment that the *quasi*-judicial role pertains to a delegated power which is legislative in nature. *Cf. Gibson, op. cit., supra* (37 *A. B. A. J.* at 479–80). The Decision and Order must therefore be reversed.

## II.

■ The railroad asks us to hold the Board may not delay a determination to await the Commission's final report. We do not see how we can, in the absence of the basic facts and the Board's findings thereon with respect to the possible impact of a rapid transit plan upon the issue of public necessity and convenience.

The railroad urges that since its tracks will remain intact, there can be no impairment of any proposed plan. That may be so, but we can not be sure. It emphasizes additionally that the report of the project director recommends "Suspension of passenger service on the Susquehanna Railroad. Alternative rail or bus services could be made available." But the ultimate plan conceivably might not go beyond a "loop" providing transportation on both sides of and across the Hudson River, leaving it to existing carriers to provide suburban service to connect therewith, and conceivably the advantages of the "loop" would induce more suburbanites to abandon travel by automobile and utilize this railroad's facilities, thereby augmenting the demand for them.

These speculations, and they can be but speculations on the record before us, raise the question whether public necessity and convenience must be determined upon the basis of existing facts. This question does not appear to have received deliberate consideration in this State. We can not think of any compelling reason thus to limit the inquiry; on the contrary, good sense commands that a reasonable estimate of the future be made. Expressions elsewhere agree. *Mulcahy v. Public Service Commission*, 101 *Utah* 245, 117 *P. 2d* 298, 301 (*Sup. Ct.* 1941); *Campbell v. Illinois Commerce Commission*, 334 *Ill.* 293, 165 *N. E.* 790, 792 (*Sup. Ct.* 1929); 3 *Pond, Public Utilities* (1932), § 784, *p.* 1585. This view is reflected in the provision of a federal statute that a railroad may not abandon any portion of a line or operation thereof unless the Interstate Commerce Commission issues "a certificate that the present or future public convenience and necessity permit of such abandonment." 49 *U. S. C. A.* § 1, *par.* 18. We have no specific statutory expression in this respect, but we have heretofore adverted to existing trends and developments which give promise of increased need for service without suggesting any doubt as to its relevancy. See *Pennsylvania Railroad Co. v. Board of Public Utility Commissioners*, 11 *N. J.* 43, 48 (1952); *In re New Jersey and New York Railroad Co.*, 12 *N. J.* 281, 289 (1953), appeal dismissed *New Jersey &*

*N. Y. R. Co. v. Board of Public Utility Com'rs,* 346 *U. S.* 868, 74 *S. Ct.* 123, 98 *L. Ed.* 378 (1953) ; *cf. In re Central Railroad Company of New Jersey,* 29 *N. J. Super.* 32, 38 (*App. Div.* 1953).

Hence we cannot abstractly find that the anticipated report of the Commission is wholly irrelevant. We, of course, agree that future needs must be reasonably rooted in reality and where, as here, a number of years must necessarily intervene between the adoption of a rapid transit plan and its fulfillment, the Board should utilize such appropriate techniques as will both do justice to the railroad and protect the public interest. If the loss of trackage were contemplated, the Board might properly conclude that the application await a clarification of the rapid transit program. On the other hand, where the tracks will remain, the Board should consider whether, if relief is otherwise warranted, it may not be fairly granted at once in view of the unquestioned power of the Board to order restoration of service at a later date. *R. S.* 48:2–24; *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners,* 5 *N. J.* 114, 122 (1950), *certiorari* denied *Brotherhood of R. Trainmen v. Pennsylvania-Reading Seashore Lines,* 340 *U. S.* 876, 71 *S. Ct.* 122, 95 *L. Ed.* 637 (1950). It should be borne in mind that an inordinate delay in decision, without adequate reason, may itself present a problem of due process. *Davis, Administrative Law* (1951), § 84, *p.* 294. We will not consider the further question projected at oral argument as to whether the Board may, if relief is granted, order the railroad to retain the released equipment to meet the eventuality of an order to restore service. We have neither the facts nor the expert view of the Board with respect to them. The most we should do is to express the general views stated above and remand the matter to the Board for prompt exercise of its judgment upon the facts as it may find them.

The Decision and Order is reversed and the matter is remanded to the Board for further proceedings not inconsistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS and FRANCIS—5.

*For affirmance*—None.