ALBERT ENOURATO, PLAINTIFF-APPELLANT, v. NEW JERSEY BUILDING AUTHORITY, THE DIRECTORS OF THE NEW JERSEY BUILDING AUTHORITY, BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, CLIFFORD A. GOLDMAN, STATE TREASURER OF THE STATE OF NEW JERSEY, EARL JOSEPHSON, ACTING DIRECTOR, DIVISION OF PURCHASE AND PROPERTY (DIVISION OF THE TREASURY, STATE OF NEW JERSEY), EDWARD F. MEARA, III, CHAIRMAN, NEW JERSEY BUILDING AUTHORITY, AND W. HARRY SAYEN, NANCY BEER, EDWARD L. HOFFMAN, JOHN H. WALTHER, AL FAIELLA, RAMON RIVERA, BERNARD E. KELCHICK, EDWARD PULVER, DIRECTORS, NEW JERSEY BUILDING AUTHORITY, DEFENDANTS-RESPONDENTS.

Argued March 22, 1982—Decided July 22, 1982.

398

David S. Lieberman argued the cause for appellant (*DeGeorge & Gendzel*, attorneys; *Murray Gendzel*, of counsel).

*Michael R. Cole*, Assistant Attorney General, argued the cause for respondents (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Sherrie L. Gibble*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

Plaintiff is a New Jersey resident and taxpayer who leases land to the State. He challenges the constitutionality of provisions of the New Jersey Building Authority Act (Act), *L.* 1981, *c.* 120, *N.J.S.A.* 52:18A–78.1 to .32, which give the Legislature the power to veto building projects and lease agreements proposed by the New Jersey Building Authority. He alleges that the legislative veto violates the Presentment Clause, Art. V, § 1, ¶ 14, and the separation of powers provision, Art. III, ¶ 1, of the

New Jersey Constitution. Plaintiff further alleges that the Act violates the State Constitution's debt limitations clause, Art. VIII, § 2, ¶ 3. For the reasons stated below, we reject plaintiff's claims and uphold the constitutionality of the challenged provisions.

I

The Legislature established the New Jersey Building Authority ("Authority") to build and operate office facilities for state agencies. *L.* 1981, *c.* 120, *N.J.S.A.* 52:18A–78.1 to .32. The Act authorizes the Authority to issue bonds and notes in an amount not to exceed $250,000,000 to be used to build those facilities. *N.J.S.A.* 52:18A–78.14(a). The bonds and notes are entirely the debt of the Authority, not the State. They must state on their face that they shall not create any indebtedness, liability or obligation of the State or any political subdivision. *N.J.S.A.* 52:18A–78.14(f).

All actions taken by the Authority must receive the Governor's approval. No action taken at any Authority meeting has any legal effect if the Governor vetoes the action within 15 days of the meeting. *N.J.S.A.* 52:18A–78.4(i).

The Act also contains two provisions that allow the Legislature to veto Authority actions. First, to commence any project whose estimated cost exceeds $100,000, the Authority must obtain a concurrent resolution of both houses of the Legislature within 45 days of the submission of the project to the Legislature for approval. *N.J.S.A.* 52:18A–78.6, –78.8(b). Second, every lease agreement between the Authority and a state agency must be approved by the presiding officer of each house of the Legislature. *N.J.S.A.* 52:18A–78.9.

On November 24, 1981, plaintiff filed suit in the Superior Court, Law Division, alleging that the Act was unconstitutional. He claimed an interest in the matter as a New Jersey taxpayer and landowner who leased a building and property to the State for use by the Department of Environmental Protection. The

Authority had proposed and the Legislature had approved building projects that might eliminate the State's need for plaintiff's facility.

The suit was filed one day before the Authority was scheduled to execute a contract for the sale of $135,000,000 in bonds. Over plaintiff's objection, the trial court granted respondents' request to schedule a show cause hearing for that same day. At the hearing respondents orally moved to dismiss the complaint. The trial court rejected plaintiff's constitutional claims and granted the motion.

The following day, November 25, 1981, respondents applied to the Appellate Division for an order reducing the time within which plaintiff could appeal the order of dismissal. The Appellate Division granted the motion requiring plaintiff to appeal by November 30, 1981 and submit briefs by December 4, 1981. Plaintiff appealed the dismissal of his complaint and filed a brief in the allotted time. On December 14, 1981 the Appellate Division heard oral argument and affirmed the dismissal. A written opinion followed. 182 *N.J.Super.* 58 (1981).

Plaintiff filed a notice of appeal with this Court on December 30, 1981, and moved for an interim restraint against the Authority's sale of bonds. The Authority cross-moved for summary affirmance. The Court denied both motions and accelerated the appeal by order dated January 19, 1982.

## II

*Constitutionality of the Legislative Veto Provisions of the New Jersey Building Authority Act*

In *General Assembly v. Byrne,* 90 N.J. 376 (1982), decided today, the Court holds that the Legislative Oversight Act, *L.* 1981, *c.* 27, is unconstitutional. By empowering the Legislature to revoke virtually all proposed executive agency rules, the Act intruded excessively upon the Executive's law enforcement authority in violation of the separation of powers. The Act also

allowed the legislative branch to effectively amend and repeal existing laws without the participation of the Governor. This violated the separation of powers, *N.J.Const.* (1947), Art. III, ¶ 1, and the Presentment Clause requirement that "[e]very bill which shall have passed both houses shall be presented to the Governor" for approval or veto. *N.J.Const.* (1947), Art. V, § 1, ¶ 14.

■ However, the Court in *General Assembly* made clear that the separation of powers leaves room for some legislative oversight and participation in executive action. Not every legislative input into law enforcement impermissably interferes with the Executive's law enforcement power. Likewise, not every action by the Legislature constitutes law making that requires a majority vote of both houses and presentment to the Governor. Where legislative action is necessary to further a statutory scheme requiring cooperation between the two branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster. [*General Assembly* at 395]

■ The Court finds that the legislative veto provisions in the New Jersey Building Authority Act, *L.* 1981, *c.* 120, *N.J.S.A.* 52:18A–78.1 to .32, fall within the proper scope of legislative oversight of executive action. The Act's veto power is limited to approval or rejection of proposed building projects and leases that require continuing budget appropriations by the Legislature. Legislative oversight therefore plays a necessary role in ensuring continuing legislative support for these projects.

At the same time, the veto provisions in the Act are limited in scope and do not empower the Legislature to "revoke at will portions of coherent regulatory schemes," *General Assembly,* 90 *N.J.* at 378. The veto therefore cannot substantially disrupt exclusive executive branch functions. Indeed, the Governor has full control over Authority decision making. Further, even repeated use of the veto has little potential to alter the underlying legislative policy of providing capital facilities to meet internal governmental needs. Nor can it subvert the Governor's

role in enforcing the law. The oversight provisions in *L.* 1981, *c.* 120, therefore violate neither the Presentment Clause nor the separation of powers.

A. *The veto provisions' role in furthering the statutory scheme.*

The New Jersey Building Authority Act created the Authority and authorized it to issue bonds and notes in an amount up to $250,000,000 to provide facilities for state agencies. Those who purchase these bonds and notes become creditors of the Authority alone and not the State. They have no remedy against the State government because the statute provides that the notes and bonds issued by the Authority are entirely its own obligation. The notes must state on their face that

neither the State nor any political subdivision thereof is obligated to pay the principal or interest and that neither the faith and credit nor the taxing power of the State or any political subdivision thereof is pledged to the payment of the principal of or the interest on the bonds or notes. [*N.J.S.A.* 52:18A–78.14(f) ]

The Authority's creditors depend on the solvency of the Authority for repayment of the money they have lent. To repay the borrowed money, the Authority in turn depends upon rental payments from the state agencies that lease the Authority's facilities. In fact, the rental fees are calculated to satisfy the Authority's obligations on its bonds and notes. When it issues those bonds and notes, however, the Authority has no enforceable promise that the state agencies will pay the Authority the rent moneys necessary to reimburse its creditors. The statute provides that

the payment of any and all rentals or other amounts required to be paid by the agenc[ies] thereunder, shall be subject to and dependent upon appropriations being made from time to time by the Legislature for that purpose .... [*N.J.S.A.* 52:18A–78.22]

The Authority's lenders thus depend upon the good faith of the Legislature in appropriating sufficient money each year to pay the rental fees that are used to repay them. The Legislature's refusal to appropriate the necessary money would not only bankrupt the Authority and force it to default on its

obligations, but would also cripple the State's ability subsequently to borrow money for any purpose. The legislators who passed the Building Authority Act therefore sought to minimize the possibility that any future Legislature would refuse to make such appropriations.

One legislative veto provision in the Act gives either house of the Legislature the power to veto any Authority project estimated to cost over $100,000, *N.J.S.A.* 52:18A–78.8(b). The other provision enables the presiding officer of either house to veto any lease agreement, *N.J.S.A.* 52:18A–78.9. These vetoes advance the crucial purpose of obtaining continued legislative support in two related ways. First, the Act makes certain that every Authority project receives a legislative imprimatur by allowing the Legislature to reject any proposed project at its inception. It follows that if the Legislature does not veto a particular project and thereby approves it, this action will constitute a strong, if not compelling, basis for the Legislature to continue to appropriate sufficient money to support the project.

Second, the legislative veto mechanism can foster close cooperation between the Legislature and the Executive in this area of mutual concern. It can induce the Authority to exercise care in selecting its projects. The veto powers are vested not only in the Legislature but in the Governor as well. *N.J.S.A.* 52:18A–78.4(i). They thus serve to ensure that the Authority acts prudently. Moreover, veto power is only one part of a broader statutory scheme ensuring fiscal prudence. For example, before the Legislature even has a chance to review a proposed building project, the Governor can veto the proposal at its inception. *N.J.S.A.* 52:18A–78.4(i). Similarly, the Authority itself faces extensive requirements before commencing any project estimated to cost over $100,000. *N.J.S.A.* 52:18A–78.6. This includes the preparation of a detailed plan describing the project's estimated costs and the anticipated appropriations necessary for all lease agreements. *N.J.S.A.* 52:18A–78.6(a). As a further assurance of fiscal prudence, the Act mandates that the Authority's board of directors include the State Treasurer, the State Comp-

troller and the chairman of the State Commission on Capital Budgeting and Planning. *N.J.S.A.* 52:18A–78.4(b).

The Legislature has the power to fund or not to fund executive agencies and the projects undertaken by those agencies. Each year the Legislature must decide which executive activities it will fund. Legislative oversight has been regarded as particularly important in some situations where legislation authorizes an executive agency to undertake projects that require continued budget appropriations. *Cf. Atkins v. United States,* 556 *F.* 2d 1028, 1063 (Ct.Cl.1977) (upholding legislative veto power over presidential recommendations for judicial pay increases under the Federal Salary Act of 1967, 2 *U.S.C.* §§ 351 to 361). The legislative veto provisions in *L.* 1981, *c.* 120, enable the Legislature to make those decisions about Authority projects at the most auspicious time possible—before the Authority begins the project. The Legislature's veto power in *L.* 1981, *c.* 120, helps ensure that the Authority will undertake financially sound projects in the way the Legislature envisioned when it passed the Building Authority Act.

We disagree with the dissent's contention that the argument for the narrow legislative veto in this case would apply equally to all executive programs requiring legislative appropriations. *Post* at 401–402. Unlike most funding situations, the approval of a building project and lease agreement locks the Legislature, for all practical purposes, into making continued appropriations. By contrast, in most cases a future legislature can discontinue appropriations if it believes the project funded is no longer necessary. Moreover, the Oversight Act's veto provisions withstand constitutional scrutiny only because they are both necessary to effectuate the statutory scheme and, as discussed below, they offer little potential for interference with executive functions or alteration of the statute's purpose. *General Assembly,* 90 *N.J.* at 395. *See post* at 405–407.

In sum, the Act's legislative veto provisions serve a necessary role in effectuating a scheme of cooperation between the Legis-

lature and the Executive to obtain capital facilities for state agencies. They serve to assure that these projects will be soundly planned and will operate efficiently with the Legislature's continued fiscal support. Our next task is to consider whether the Act constitutes an undue legislative interference with executive functions or improper legislative policy making without the Governor's participation.

B.  *The legislative veto's limited effects on the separation of powers.*

The legislative veto provisions in *L.* 1981, *c.* 120, serve a necessary legislative oversight purpose in ensuring that the projects approved by the Authority will receive continued legislative support. At the same time, the veto offers little of the potential for improper uses that led the Court to strike down the extremely broad veto provision in *General Assembly v. Byrne, supra.*

Three significant factors distinguish the veto provisions in the Building Authority Act from those in the Legislative Oversight Act that the Court struck down in *General Assembly.* First, the Governor's full control over the selection of Building Authority projects makes it impossible for the Legislature to usurp executive authority in ways that were possible under the Legislative Oversight Act. Pursuant to *N.J.S.A.* 52:18A–78.4(i), the Governor has 15 days to veto any Authority decision. The Legislature has absolutely no control over Authority projects unless the Governor first approves them.

A legislative veto in a particular statute may not offend the constitutional allocation of governmental powers if the statute gives the Executive extensive authority in the policy-making process. In *Brown v. Heymann,* 62 *N.J.* 1 (1972), this Court upheld the Executive Reorganization Act, which authorized the Governor to prepare an executive reorganization plan and present it to both houses of the Legislature. The Court found no constitutional infirmity in the Legislature's power to pass a

concurrent resolution within 60 days disapproving the plan.[1]
*See also Atkins v. United States, supra.*

Second, because the Legislature's veto power is limited to the
rejection of discrete projects and leases, it has limited potential
to interfere with executive action. One significant constitution-
al defect in the Legislative Oversight Act was its potential for
"allowing the Legislature to control agency rulemaking," 90 *N.J.*
at 385. Executive agencies are charged with designing coher-
ent plans to implement existing statutes. Where the Legisla-
ture has the power to veto any portion of a coherent scheme of
regulation, it can

> undermine performance of that duty by ... nullify[ing] virtually every existing
> and future scheme of regulation or any portion of it.... Moreover, the
> Legislature need not explain its reasons for any veto decision. Its action
> therefore leaves the agency with no guidance on how to enforce the law. [90
> *N.J.* at 386–387]

By contrast, the veto provision here cannot cause any such
disruption. The Legislature cannot veto any arbitrary portion
of a proposed Authority project. It must either veto the entire
project or let the project proceed. Any "disruption" of Building
Authority action in this context is actually part of the legislative
scheme and can be considered necessary to further the statutory
purpose of ensuring that the Legislature will support the build-
ing projects selected.

Moreover, the Legislature cannot coerce the Authority into
proposing projects solely on the Legislature's own terms, since
the Governor has veto power over every agency decision. *N.J.
S.A.* 52:18A–78.4(i). The Legislature can forestall Authority
action by repeatedly vetoing proposed projects, but it cannot
engage in the types of intrusion and disruption that occur when
the Legislature has total and arbitrary control.

---

[1]The dissent seeks to distinguish *Brown* on the ground that the Legislature
there had to affirmatively wield its veto power to block executive action,
while here the executive action takes effect only if the Legislature votes to
approve it. We see no relevant distinction for purposes of constitutional
analysis since in either instance the Legislature has identical power to impede
executive functions.

Third, even repeated use of the veto would not be likely to alter the legislative intent in ways that require presentment to the Governor under the Presentment Clause. *N.J.Const.* (1947), Art. V, § 1, ¶ 14. In enacting the Building Authority Act, the Legislature clearly did not want the Authority to undertake any project unless it met with both legislative and gubernatorial approval. Exercise of the veto provisions is not inconsistent with the regulatory framework the Legislature has erected to assume tight controls over the selection of Authority building projects and leases.

We recognize that future legislators may veto a particular project that the legislators who passed the Act might have thought desirable. But this type of judgment is fundamentally different from a subsequent legislative nullification of a policy that a former Legislature enacted into law. *General Assembly,* 90 *N.J.* at 389. This crucial difference is illustrated in *Consumer Energy Council of America, etc. v. Fed. Energy Reg'y Comm'n,* 673 *F.*2d 425 (D.C. Cir. 1982). The potential to interfere with exclusive executive responsibilities or to effectively alter the policy of existing laws without presentment to the Governor, which rendered the Legislative Veto Act in *General Assembly* unconstitutional, is negligible under the limited veto power in the Building Authority Act.

The above arguments notwithstanding, the legislative veto provisions in the Building Authority Act have some limited potential to interfere with executive functions and allow policy judgments without the participation of the Governor. Although the Legislature clearly intended tight controls over the Authority's selection of building projects, repeated legislative vetoes conceivably would prevent the Authority from commencing any projects at all. This legislative action would effectively repeal the Act without the constitutionally required presentment to the Governor. However, the mere remote possibility of never-ending legislative vetoes is insufficient to invalidate a veto provision that serves an important governmental purpose.

More troubling is the fact that either house of the Legislature can veto proposed projects. This allocation of power tends to contravene the principle of bicameralism that "[i]n republican government, the legislative authority necessarily predominates [and therefore] . . . [t]he remedy . . . is to divide the legislature into different branches," *The Federalist No. 51* at 338 (R. Luce ed. 1976) (Hamilton or Madison). A one-house veto frustrates "[t]he overriding objective of bicameralism . . . to constrain the exercise of . . . legislative power by making sure that the Legislature can act only where representatives of two different constituencies are in agreement." *Consumer Energy*, 673 *F*.2d at 464 (footnote omitted).

The one-person veto provision in *N.J.S.A.* 52:18A–78.9, which allows either presiding officer to veto a proposed lease agreement, exacerbates this problem of concentrating legislative control. In *Opinion of the Justices*, 431 *A*.2d 783 (N.H. 1981), the Supreme Court of New Hampshire invalidated provisions giving legislative veto power to standing committees and the presiding officers of both houses of the Legislature. The court held that although the "legislative veto is not *per se* unconstitutional . . . wholesale shifting of legislative power to such small groups in either house cannot fairly be said to represent the 'legislative will.' " 431 *A*.2d at 788. *Cf. Atkins v. United States*, 556 *F*.2d at 1064 (upholding the veto provisions under the Federal Salary Act, but stating that "[i]t is not as if the 'veto' is imposed by one committee of Congress or one member").

A concentration of authority in one house of the Legislature or in one legislator threatens the separation of powers and the principle of bicameralism unless that power is narrowly circumscribed. As we have stated, not every legislative action requires the approval of both houses and presentment to the Governor. The more limited the grant of power, the more concentrated it can be without violating the Presentment Clause or the separation of powers. Here, the delegated authority is narrowly limited. No single house or single legislator is empowered to approve new legislation. No danger of precipitate legislative

action is posed. To the contrary, the veto provisions of the Act provide *additional checks* against Building Authority projects which may in the future prove unwise or unduly costly. The presiding officers have power to disapprove the lease agreements only for building projects that the Legislature has already approved. These lease agreements involve no policy determinations whatsoever; they merely establish rental rates sufficient to allow the Building Authority to repay its bondholders. Thus, the Act's veto provisions, despite their failure to conform with the principle of bicameralism, do not offend the Constitution.

## III

### *The Debt Limitation Clause*

■ We also reject plaintiff's argument that the New Jersey Building Authority Act, *L.* 1981, *c.* 120, *N.J.S.A.* 52:18A–78.1 to .32, violates the debt limitations clause of the State Constitution. *N.J. Const.* (1947), Art. VIII, § 2, ¶ 3.

Plaintiff claims that the debts of the Authority resulting from its issuance of notes and bonds are debts of the State, and therefore the procedures in Art. VIII, § 2, ¶ 3 must be followed. The Court rejected this argument in *Clayton v. Kervick,* 52 *N.J.* 138 (1968). In that case, as here, the Legislature created an independent authority empowered to borrow money and issue bonds that were not the liabilities of the State or any political subdivision. In *Clayton,* the New Jersey Educational Facilities Authority built school facilities with the borrowed money and leased them to schools, whose rental payments were used to repay the Authority's creditors. The Court held that the Authority's debts were not debts of the State, despite "[t]he fact that the rentals were admittedly geared to satisfy the bonded indebtedness and enable the State ultimately to become the owner of the buildings," 52 *N.J.* at 153.

Similarly, in *Holster v. Bd. of Trustees of Passaic County College,* 59 *N.J.* 60 (1971), the Court upheld the County College Bond Act, under which a county issued bonds whose repayment

was expressly subject to appropriations being made by the Legislature. The Court stated:

> Although there is doubtless a strong likelihood that payment of the bonds will in fact be met by legislative appropriations, we find nothing in the statute compelling the State to make such payments as a matter of law. Hence, both issuing counties and purchasing bondholders are on notice that the faith and credit of the State will not be pledged in respect of bonds issued pursuant to this enactment, but that payment on the part of the State will be dependent upon appropriations provided from time to time. [59 *N.J.* at 66–67]

No relevant distinction exists between the financing schemes upheld in those cases and that in the New Jersey Building Authority Act. The Authority's bonds and notes are not a debt or liability of the State. They state on their face that the State does not pledge its faith and credit to their payment. *N.J.S.A.* 52:18A–78.14(f). Although the Act not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result, *supra* at 402–404, the State is under no legal obligation to do so. The Authority's creditors have notice that their only remedy lies against the Authority.

Nor does the liability of the State on its lease agreements with the Authority create any debt of the State. Both the statute and the lease make clear that all rent payments from the State are subject to legislative appropriations. Moreover, the State may incur liability for future rentals without violating the debt limitations clause. *See Bulman v. McCrane*, 64 *N.J.* 105, 117–18 (1973). Plaintiff does not contend otherwise.

Since the Building Authority Act does not authorize the creation of any debts by the State, the debt limitations clause, *N.J. Const.* (1947), Art. VIII, § 2, ¶ 3, does not apply to the Authority's debts or any obligations of the State on its lease agreements with the Authority. We have already disapproved the contrary result reached by a sharply divided Court in *McCutcheon v. State Building Authority*, 13 *N.J.* 46 (1953), and now expressly overrule that case.

## IV

For the above reasons, the New Jersey Building Authority Act, *L.* 1981, *c.* 120, does not violate the separation of powers,

Art. III, ¶ 1, the Presentment Clause, Art. V, § 1, ¶ 14, or the debt limitations clause, Art. VIII, § 2, ¶ 3, of the New Jersey Constitution. The New Jersey Building Authority can issue bonds and notes and negotiate lease agreements with state agencies under the procedures set forth in the Act. The judgment of the Appellate Division is affirmed.

SCHREIBER, J., dissenting and concurring.

When tested by the principles decided today in *General Assembly v. Byrne,* 90 *N.J.* 376 (1982), the New Jersey Building Authority Act, *N.J.S.A.* 52:18A–78.1, *et seq.,* includes a classic example of a violation of the state constitutional requirement of separation of powers by enabling the Legislature to control an executive agency's essential functions. The Legislature has refined this intrusion by vesting each of its components, the Senate and Assembly, as well as their individual leaders, with the power to thwart the agency's ability to execute the law. It has thereby violated the constitutional structure of bicameralism. Lastly, the Act implicitly violates the Presentment Clause of the Constitution, which requires submission to the governor for his approval or disapproval before a law can become effective.

Whether a power is executive, legislative or judicial is not always clear. In some situations the subject may be deemed to have the characteristic of more than one type of power. For example, some rules of evidence are distinctly procedural in nature and may be promulgated by the judiciary. Others have a much more substantive gloss and may be more appropriately enacted by the Legislature. *See* Evidence Act of 1960, *L.* 1960, *c.* 52. When that occurs, a sharing of power may be appropriate. *See Knight v. Margate,* 86 *N.J.* 374, 388–89 (1981). In other situations it may be fitting for one branch of government to exercise a power traditionally belonging to another. Thus, in executing and administering a law, the executive branch of government may legislate by adopting rules and may adjudicate by resolving adversarial interests. A third category is illustrat-

ed by one branch being called upon to perform an act incidental to a function belonging to another branch of government. Thus, the Chief Justice has been given the power to designate certain public trustees of the Prudential Insurance Company although execution of the insurance laws is an executive prerogative.

However, an outer limit of all these intrusions is that none may undermine the independence and integrity of a branch of government or that branch's ability to exercise the constitutional check with which it has been endowed. *See Myers v. United States*, 272 *U.S.* 52, 292–93, 47 *S.Ct.* 21, 84–85, 71 *L.Ed.* 160, 242 (1926) (Brandeis, J., dissenting). Examination of the problem before us should be made with these underlying principles in mind.

The New Jersey Building Authority (Authority) resembles numerous other agencies charged with carrying out their respective laws. The Authority, a corporate body, has been placed within the Department of the Treasury. It has 12 directors, including the State Treasurer, Comptroller of the Treasury, and Chairman of the Commission on Capital Budgeting and Planning, these three being members *ex officio.* The Governor appoints the remaining nine directors, two of whom are to be recommended by the President of the Senate and two by the Speaker of the General Assembly. The directors have four-year terms, except that those recommended by the legislative leaders may serve only during the two-year legislative term in which they are appointed. Any action taken by the Authority requires at least seven affirmative votes. All such action must be reflected in the minutes of the meeting and are subject to a gubernatorial veto.

The Authority's general powers are typical of regulatory agencies. It may adopt by-laws and an official seal, sue and be sued, and enter into contracts necessary or incidental to the performance of its duties. Its reason for existence is to provide office space for state agencies. To accomplish this the Authori-

ty is authorized to raise the necessary capital funds by issuing bonds and notes, the aggregate principal amount not to exceed $250,000,000 at any time. The State has no direct obligation to pay this debt, although the state agencies have an obligation to pay the rents under the leases that they enter into with the Authority and which rents are to be pledged to secure the bonds and notes.

The Authority is authorized to construct and improve office buildings necessary or convenient for the operation of any state agency. It must decide if a project is feasible. The Governor, however, can veto any project. If he does not and the costs are $100,000 or less, the Authority may proceed. However, if the costs are greater, the report proposing the project must be submitted to the Legislature. The Authority cannot proceed unless both the Senate and Assembly adopt resolutions of approval. Even if the Legislature has sanctioned the proposal, the President and the Speaker of the General Assembly must approve each lease made by a state agency with the Authority.

I

## Separation of Powers

Justice Pashman has described in *General Assembly v. Byrne, supra,* the overriding concern of the Founding Fathers that the Legislature might arrogate unto itself undue power. This concern and a desire to facilitate the administration of government by having the executive, rather than the Legislature, handle the details involved in administering and executing the laws are the primary reasons for the separation of powers implicit in the Federal Constitution and expressly set forth in the State Constitution in Art. III, par. 1.

A violation of the constitutional separation of powers precept occurs when, as stated in *General Assembly,* there is "unwarranted legislative interference with the executive branch and excessive legislative law-making power" so that the Legislature "can gravely impair the functions of the agencies charged with

enforcing," administering and executing the statutes. *General Assembly v. Byrne*, 90 *N.J.* at 385. Legislative interference can violate the goals of a statute. This is particularly so when the legislative veto overrides a central or essential component of the executive authority. Moreover, "[t]he Legislature cannot [lawfully] pass an act that allows it to violate the Constitution." *Id.* at 391. Professor Bickel expressed a similar thought in his testimony before the Subcommittee on Separation of Powers of the Senate Committee of the Judiciary:

[T]he constitutional separation of powers is not ordained for the convenience of the separate branches of the Government, as they may from time to time conceive it, but is intended to insure observance of certain principles which the framers believed would conduce to effective and responsible Government consistent with the liberties of the people. Hence neither the Congress nor the President may choose to suspend these principles when convenient. [Congressional Hearings, September 15, 1967, at 247]

The New Jersey Building Authority Act cannot withstand these separation of power tests. The Authority is an agency in the executive branch of the government. No one has questioned the adequacy of the standards under which it is to approve a project to house another state agency or to determine the project's financial feasibility. Yet, the Legislature has retained control over the *heart* of the Authority's reason for being. It is the Authority, subject to the Chief Executive's approval, that determines whether a project is feasible and should be effectuated. But still the project cannot move forward without the approval of each house of the Legislature. What could constitute greater legislative control over an executive department of government!

The majority contends that legislative approval of a project will constitute "a strong, if not compelling, basis for the Legislature to continue to appropriate sufficient money" throughout all future years, to pay the rent required under the leases. *Ante* at 403. It argues that the approval of a project and lease agreement "locks the Legislature, for all practical purposes, into making continued appropriations...." *Ante* at 404. It is one thing to appropriate dollars annually and quite another

to bind one's self ahead of time to make appropriations. Obviously, the Legislature that approves a project in 1982 does not control future Legislatures. This is particularly evident when Legislatures must appropriate funds each year to enable tenants to pay their rents throughout lease terms as long as 35 years. Legislatures are not bound as courts are by precedent; yet even the judiciary is not "locked in." *See, e.g., Schaad v. Ocean Grove Camp Meeting Ass'n,* 72 *N.J.* 237 (1977), overruled in *State v. Celmer,* 80 *N.J.* 405, 418 (1979).

More importantly whether the Legislature exercises the discretion to finance or not to finance governmental operations cannot justify a legislative intrusion into the executive power. Stating the proposition demonstrates its inherent weakness. Legislative control over appropriation purse strings does not warrant violation of the constitutional separation of powers. Otherwise the Legislature could through this mechanism direct the operations of all executive functions. Neither the Legislature's surrender of its appropriation authority, which is questionable to say the least, nor its exercise of that authority entitles the Legislature to assume a power in contravention of the Constitution. The contention that the Legislature's appropriation power entitles it to share in the executive function of formulating and planning housing projects entrusted to the Authority is not sound.

## II

### Bicameralism and Legislative Delegation of Power

The Constitution vests the legislative power in a Senate and General Assembly. *N.J. Const.* (1947), Art. IV, § 1, par. 1. The 1966 Constitutional Convention rejected a move to change to a unicameral legislature because of the constraint that bicameralism imposes upon the exercise of legislative power. Our constitutional provision is modeled after the federal scheme, both serving the same purposes. It is pertinent, therefore, to note Judge Wilkey's comments in *Consumer Energy Council of*

*America v. Federal Energy Regulatory Commission*, 673 *F.2d* 425, 464 (D.C.Cir.1982):

The overriding objective of bicameralism, then, is to constrain the exercise of the federal legislative power by making sure that the Legislature can act only where representatives of two different constituencies are in agreement.

*See also The Federalist,* No. 51 (J. Madison).

We have seen that either house of the Legislature can amend the Building Authority Act by vetoing projects approved by the executive branch of the government. Thus, one body may determine whether a duly enacted statute should be administered, this in defiance of the constitutional mandate that both the Senate and General Assembly must approve every bill. *See N.J. Const.* (1947), Art. V, § 1, par. 14(a).

As the Senate may not delegate its legislative power to the General Assembly, so, too, neither the Senate nor the General Assembly may delegate its legislative authority to a smaller body. It is obvious that the Senate could not delegate to a committee of its members the right to pass a bill. This can be done only by a majority of its members. Therefore, neither the Senate nor the General Assembly has the authority to delegate to its respective presiding officers the authority to approve each lease to be entered into between a state agency and the Authority. No standards or guidelines bind these legislative officers. Either could negate a proposed lease and doom to failure a project approved by the Authority, the Governor, and even the Legislature.

*Springer v. Philippine Islands*, 277 *U.S.* 189, 48 *S.Ct.* 480, 72 *L.Ed.* 845 (1928), has long been the leading opinion in this area of the law. There the Supreme Court struck down a statute vesting authority in the President of the Senate and Speaker of the House of Representatives of the Philippine Islands to vote government-owned stock in the Philippine National Bank, observing:

Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to

enlarge further upon the general subject, since it has so recently received the full consideration of this court. *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160.

Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive. [*Id.* at 202, 48 *S.Ct.* at 482, 72 *L.Ed.* at 849]

Neither house of the Legislature may create effective legislation alone. Nor may it delegate essential executive or legislative duties to the Senate President or Speaker of the Assembly. The New Jersey Building Authority Act contravenes these principles.

## III

### Presentment Clause

Another important constitutional check on the legislative power is found in the Presentment Clause, *N.J.Const.* (1947), Art. V, § 1, par. 14(a). Every bill passed by both houses must be presented to the Governor. If he approves, it becomes law. If not, the Legislature may reconsider the matter and then, if two-thirds of each house votes for passage, the bill becomes law. The Presentment Clause serves two purposes. It protects the executive from an overreaching legislative power that could effectively thwart the executive in performing his constitutional charge of executing the laws. *See The Federalist,* No. 73 (A. Hamilton). The second purpose is to prevent hasty or imprudent legislation. It has also served as a means of expressing the policy of the chief executive, the only official elected statewide.

The legislative action under the Building Authority Act is essentially legislative in nature.[1] Even if it is contended that

---

[1] One commentator has stated: "Since the Constitution plainly requires presidential participation in the exercise of legislative power, a power must be classified as non-legislative to justify its exercise by Congress or one of its branches in a way other than that prescribed." R. W. Ginanne, "The Control

when the Legislature disapproves a project, it acts as an administrative agency, much as that agency itself acts when it declines to approve a project, that would violate the separation of powers. When the Legislature approves a project, its action is more akin to acting in a legislative capacity. It need follow no standards or criteria, other than constitutional ones. However, both approval and disapproval by the Legislature involve the Senate and General Assembly in a legislative review mechanism. This mechanism can be utilized only in accordance with the constitutional scheme. That scheme requires conformance with the Presentment Clause. There is no other way in which the Legislature may act legislatively. *See In re N.Y., Susquehanna & Western R.R. Co.*, 25 *N.J.* 343 (1957) (concurrent resolution may express opinion, but lacks operative effect of legislation).

It is no answer to say that the Governor had previously approved the project and therefore the Presentment Clause has not been violated. Otherwise, the Legislature could always seek proposals from the Governor and thereafter adopt them without presentment to the Governor. No one would seriously claim that such an adoption would constitute duly enacted legislation. The Constitution contemplates the Governor will act *after* the Legislature has completed its deliberations, not before. Legislative hearings might disclose facts or reasons that impel the executive to change his position. Sanction of a plan having prior gubernatorial approval and elimination of the presentment of the act after passage by the Legislature reverses the constitutional scheme of the legislative check and power placed in the executive—and without any valid reason. *Cf.* Justice Mountain's comment in *Vreeland v. Byrne*, 72 *N.J.* 292, 304–05 (1977), in which he advocates literal compliance with constitutional provisions governing details of governmental administration. Neither the Governor nor the Legislature may choose to suspend constitutional procedures.

---

of Federal Administration By Congressional Resolutions and Committees," 66 *Harv. L. Rev.* 569, 593 (1953).

## IV

Some recent judicial opinions that have carefully considered these problems of presentment, separation of powers and bicameralism have declared legislative attempts to circumvent these provisions invalid. *See Consumer Energy Council of America v. Federal Energy Regulatory Commission*, 673 *F.*2d 425 (D.C.Cir. 1982);[2] *Chadha v. Immigration and Naturalization Service*, 634 *F.*2d 408 (9th Cir. 1980), *cert.* granted, 454 U.S. 812, 102 *S.Ct.* 87, 70 *L.Ed.*2d 80 (1981); *Opinion of the Justices*, 431 *A.*2d 783 (N.H.1981); *State ex rel. Barker v. Manchin*, 279 *S.E.*2d 622 (W.Va.1981); *State v. A.L.I.V.E. Voluntary*, 606 *P.*2d 769 (Alaska 1980).

The only recent decision of this Court which relates to this subject is *Brown v. Heymann*, 62 *N.J.* 1 (1972). However, that decision did not discuss the problems presented in this case. The issue in *Brown* was whether the Executive Reorganization Act

---

[2]Judge Wilkey's opinion contains a comprehensive discussion of the Presentment Clause, bicameralism, and separation of powers. 673 *F.*2d at 461–78. He held that the provision authorizing either house of Congress to disapprove a regulation of the Federal Energy Regulatory Commission (FERC) under the Natural Gas Policy Act of 1978, 15 *U.S.C.* §§ 3301–3342, was unconstitutional for several reasons. Congress could not create a device enabling it to control agency rulemaking; the Presentment Clause was evaded because the President had had no opportunity to exercise his right of veto; the constitutional requirement of bicameralism was violated because one house could affect the validity of the regulation; congressional expansion of its role to one of shared administration of the law contravened separation of powers; and the entire scheme adversely affected the constitutional system of checks and balances.

The majority, in considering this opinion, has isolated one point in Judge Wilkey's discussion as crucial, that is, that the subject matter involved a "basic policy judgment." The opinion is not so circumscribed. However, even that standard does not differentiate this case. Here the Authority is making basic policy decisions with respect to where a state governmental body should be located, the adequacy of the facilities, and the costs involved. Though these policy decisions are different from whether incremental pricing should apply to boiler fuel, both the Authority and FERC have been entrusted with basic policy decisions within their respective substantive spheres.

of 1969 "so enhance[d] the executive power as to threaten the security against aggregated power which the separation-of-powers doctrine was designed to provide." *Id.* at 10. The Court answered that proposition in the negative. The statute authorized the Governor to prepare a reorganization plan of executive departments and to submit each plan to the Legislature. If the Legislature did not pass a concurrent resolution opposing the plan, it would become effective. See *N.J.S.A.* 52:14C–7(c). It was observed that the Legislature could express only disapproval. No affirmative legislative action was needed to have the plan become law. This is to be differentiated from the Building Authority Act under which the Legislature must act affirmatively before the project is effective and presiding officers of each house must approve leases that are essential to the realization of a project.

I sympathize with what the Legislature is seeking to accomplish in reviewing actions of administrative agencies. However, it is not without recourse. The Legislature could, of course, express its views during rulemaking hearings under the Administrative Procedure Act. It has also been suggested that the Legislature could require that rules would not become effective for a period of thirty days so that the Legislature could, if it so desired, pass a statute within that time nullifying or modifying proposed regulations. *See* Watson, "Congress Steps Out: A Look at Congressional Control of the Executive," 63 *Calif.L.Rev.* 983, 1060–61 (1975). It has also been proposed that the Legislature's direction should perhaps be to do more reviewing of what the administrative agencies are doing and then rewriting the laws in light of their administration, rather than reshaping and redirecting the administration of its laws. I am certain there are many other legislative oversight mechanisms that will fulfill the Legislature's desire that the laws be interpreted in accordance with its intent.

Though I believe those sections of the Building Authority Act relating to legislative concurrence in the Authority's projects

and approval of the leases by the presiding officers of each legislative house are invalid, I am of the opinion that the balance of the statute may stand. Paragraph 31 of the Act evidences a broad legislative intent to that effect:

> If any clause, sentence, paragraph, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, the judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section or part thereof directly involved in the controversy in which the judgment shall have been rendered.

I agree with the majority that the debt limitation clause, Art, VIII, § 2, par. 3, has not been violated, although this is a close question because of the State's obligations under the leases.

I join in the judgment that the sale of the bonds in the principal amount of $135,000,000 under the New Jersey Building Authority Act, as modified, would not violate the New Jersey Constitution.

Justice CLIFFORD joins in this opinion.

CLIFFORD and SCHREIBER, JJ., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For reversal*—None.