695 A.2d 654

GEORGE A. SPADORO, INDIVIDUALLY AND AS MAYOR OF EDISON TOWNSHIP, MIDDLESEX COUNTY, NEW JERSEY, PLAINTIFF–APPELLANT, v. CHRISTINE TODD WHITMAN, GOVERNOR OF THE STATE OF NEW JERSEY, AND BRIAN CLYMER, TREASURER OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

June 30, 1997.

**ORDER**

HANDLER, J., concurring in part and dissenting in part.

Plaintiff George A. Spadoro, individually and as mayor of Edison Township, has challenged the constitutionality of the Pension Bond Financing Act of 1997 ("Bond Act"), *L.*1997, *c.* 114. The Bond Act provides for the issuance of approximately $2.7 billion in bonds by the Economic Development Authority ("EDA"), with the proceeds to be used to pay the State's obligations for the unfunded accrued liability of several state pension systems. The State, in turn, will pay the interest and principal payments on the bonds, subject to future legislative appropriations.

Plaintiff sought a declaratory judgment against defendants Governor Christine Todd Whitman and Brian Clymer, the State Treasurer, that the Bond Act was unconstitutional and, further, that the proposed state budget for fiscal year 1997–98 violates the New Jersey Budget Act. Plaintiff asked the Superior Court, Law Division, to declare that the budget submitted by the State Treasurer must be balanced, to enjoin defendants from taking any action in furtherance of the proposed bond sale, and to enjoin the Governor from submitting to the Legislature a budget that is balanced based upon the bond issue. Plaintiff's complaint alleged that the Bond Act violated several provisions of the New Jersey Constitution, namely, Article VIII, Section II, Paragraph 3 (the Debt Limitation Clause); Article VIII, Section II, Paragraph 2 (the Appropriations Clause); Article III (the Separation of Powers); Article IV, Section VII, Paragraph 4 (the Single Object Clause); and Article IV, Section VII, Paragraph 3 (the Contract Clause).

In an unreported opinion, the Superior Court granted defendants' motion for summary judgment on June 10, 1997. *Spadoro v. Whitman*, No. MER1051-97. The court found that the Act was in violation of neither the Debt Limitation Clause, *N.J. Const.* art. VIII, § 2, ¶ 3, nor the Single Object Clause, *N.J. Const.* art. IV, § 7, ¶ 4, in effect, obviating a separate determination of the other alleged constitutional violations. The Appellate Division summarily affirmed the judgment of the Law Division in favor of defendants. The Court today dismisses plaintiff's challenge on grounds of mootness.

Because of the dismissal of this case, and the fact that the decision of the trial court was, of necessity, relatively abbreviated and unpublished, the disposition of this litigation does not represent a significant constitutional adjudication. Even if the case may be considered moot, I believe it should be adjudicated because of the importance of the underlying issue and the possibility of its recurrence. To that extent, I dissent from the Court's order

and write to express my view that the Bond Act violates the Constitution's Debt Limitation Clause.

The central issue in this action is whether the Bond Act violates the Debt Limitation Clause of the State Constitution.[1] That clause provides:

> The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged.

> Except as hereinafter provided, no such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

> [N.J. Const. art. VIII, § 2, ¶ 3.]

The application of the Debt Limitation Clause to the Bond Act requires a detailed analysis of the legislation.

The Bond Act was signed into law on June 5, 1997. It provides for the issuance of approximately $2.7 billion in bonds to fund the accrued unfunded liability of the pension systems, estimated in the statute at $3.2 billion.

---

[1] The trial court determined the Act did not violate the Single Object Clause, *N.J. Const.* art IV, § 7, ¶ 4. The court reasoned that under *New Jersey Ass'n on Correction v. Lan,* 80 *N.J.* 199, 403 *A.2d* 437 (1979), it is for the Legislature in the first instance to determine the relatedness of items included within the legislation and "[u]nless the legislative choice of inclusion of items within a single legislative object is plainly wrong, there is no reason under *Lan* to disturb that choice." The court concluded that the authorization of the EDA "to sell the bonds" is an "object [that] is not separate nor unrelated to the further legislative object of addressing who may buy them."

The Legislature made several findings in the Bond Act. The State currently appropriates funds on an annual basis to fund the State's obligations under its several pension funds. § 2a. These annual contributions consist in part of an "unfunded accrued liability contribution" that represents pension benefits earned in prior years which, pursuant to standard actuarial practices, are not yet fully funded. *Ibid.* The primary cause of the State's accrued unfunded liability is the required inclusion of funding for pension adjustment or cost-of-living adjustment benefits within the various pension funds. § 2b. The State's current unfunded accrued liability is approximately $3.2 billion for the following seven pension funds: the Teachers' Pension and Annuity Fund, the Public Employees' Retirement System, the Police and Firemen's Retirement System, the State Police Retirement System, the Judicial Retirement System, the Prison Officers' Pension Fund, and the Consolidated Police and Firemen's Pension Fund.

The Legislature declared that "[i]t is in the public interest to fund this unfunded accrued liability, in full or in part, through the issuance of bonds, notes or other obligations by the New Jersey Economic Development Authority which shall be retired through annual payments to be made by the State, subject to appropriation by the State Legislature." § 2c. It found that through the issuance of bonds or other debt obligations "the State will achieve significant savings and will eliminate the need for pension contributions on an annual basis to fund this unfunded accrued liability." § 2d. It contemplated that the proceeds raised from the sale of the bonds or other obligations "shall not be less than approximately $2.7 billion." § 2e. (The bond proceeds of $2.7 billion apparently will be sufficient to eliminate the unfunded liability when coupled with the revaluation of the pension systems' assets.) The Act also anticipates achieving savings for the State by amortizing the bonds over a shorter period of time than the current amortization of the unfunded liability, with the difference between the payment of principal and interest on the bonds and the estimated contributions toward the unfunded liability that the State would

otherwise be obligated to pay providing significant savings to the State. § 2f.

The Bond Act authorizes the EDA to issue bonds yielding $2.75 billion in proceeds to fund, in full or in part, the unfunded accrued pension liability as it is certified by the State Treasurer and reported to the EDA. §§ 4a, g. The period of maturity of the bonds shall not exceed thirty-eight years. § 4b. The statute provides that the "bonds ... issued by the authority pursuant to this act shall be special and limited obligations of the authority payable from, and secured by, such funds and moneys determined by the authority in accordance with this section." § 4e.

No EDA resolution authorizing the issuance of bonds will be effective without the approval in writing of the State Treasurer. § 4d. Nonetheless, the Bond Act limits liability on the bonds to the EDA alone:

> Bonds and refunding bonds issued by the authority pursuant to this act shall be special and limited obligations of the authority payable from, and secured by, such funds and moneys determined by the authority in accordance with this section.... Bonds or refunding bonds issued pursuant to the provisions of this act shall not be a debt or liability of the State or any agency or instrumentality thereof, except as otherwise provided by this subsection, either legal, moral or otherwise, and nothing contained in this act shall be construed to authorize the authority to incur any indebtedness on behalf of or in any way to obligate the State or any political subdivision thereof, and all bonds and refunding bonds issued by the authority shall contain a statement to that effect on their face.

[§ 4e.]

The Act also authorizes the State Treasurer to enter into contracts to fund the EDA's payment obligations on the bonds. § 6. The Act provides that, in accordance with these contracts, "[t]he State Treasurer *shall*, in each fiscal year, pay from the General Fund to the authority ... an amount equivalent to the amount due to be paid in such State fiscal year to pay the debt service incurred for such State fiscal year on the bonds or refunding bonds of the authority issued pursuant to this act and any additional costs authorized by section 4 of this act." § 5a (emphasis added). The EDA can pledge the contract with the State for the payment or redemption of the bonds. § 4b.

Section 6 of the Bond Act provides that "the incurrence of any obligation of the State under the contract or contracts, including any payments to be made thereunder from the General Fund, shall be subject to and dependent upon appropriations being made from time to time by the Legislature for the purposes of this act." The contracts must also provide that "all such payments from the General Fund shall be subject to, and dependent upon, appropriations being made from time to time by the Legislature for such purposes...." § 5b. Any payment contract between the State and the EDA must also follow a payment schedule laid out in the Act.

The Bond Act also imposes certain obligations on the State in respect of the bondholders, but specifically excludes any obligation to appropriate future moneys for any purpose:

> The State hereby pledges and covenants with the holders of any bonds or refunding bonds issues pursuant to the provisions of this act, that it will not limit or alter the rights or powers vested in the authority by this act, nor limit or alter the rights or powers of the State Treasurer in any manner which would jeopardize the interest of the holders or of any trustee of such holders, or inhibit or prevent performance or fulfillment by the authority or the State Treasurer with respect to the terms of any agreement made with the holders of these bonds or refunding bonds or agreements made pursuant to subsection c. of section 4 of this act except that the failure of the Legislature to appropriate moneys for any purpose of this act shall not be deemed a violation of this section.
>
> [§ 4i.]

The Bond Act provides that the bonds are deemed to be issued for an essential governmental purpose and shall be exempt from taxes. § 4h. It also provides that the State and all political subdivisions of the State may invest in the bonds. § 4j. It requires the State Treasurer to make an annual report to the Governor and the Legislature regarding the status of the debt and payments, along with an estimate of the remaining time in which any debts incurred pursuant to the Act will be outstanding. § 7.

Two statutes were enacted at the same time as the Bond Act. *L.*1997, *c.* 115, amends certain accounting procedures for the State-run pension systems. The statute allows recent market gains to be recognized in full when calculating the pension sys-

tems' assets, allows the proceeds from the bond sale to be used in calculating the pension systems' assets, and allows any excess assets over the current unfunded liability to be used to reduce the State's annual normal contribution to the pension systems.[2] L.1997, c. 113 confirms that the affected State-run retirement systems will conform to federal Internal Revenue Code requirements.

The constitutional Debt Limitation Clause prohibits "one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum." *City of Camden v. Byrne,* 82 *N.J.* 133, 411 *A.*2d 462 (1980) (quoting *New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 292 *A.*2d 545 (1972)). I am convinced that the $2.7 billion bond issue violates the intendment and purpose of the Debt Limitation Clause and that the prior approval of the citizenry, therefore, should have been required prior to its issuance.

We have determined generally that debts are non-state-debts if (1) they are created by an independent authority, *see, e.g., New*

---

[2] The statement accompanying the bill, Senate Bill No. 2148, describes the changes:

> This bill changes the value of the assets of [the retirement] systems to "full-market" value of assets, for the State and participating local governments, as of the valuation reports applicable to FY 1998. This one-time accounting change from the current "market-related" value of assets (20 percent of full-market) to "full-market" immediately recognizes recent capital gains instead of recognizing those gains over five years, resulting in an increased value of the accumulated assets. For valuation reports applicable to FY 1999 and thereafter, the actuarial value of assets will revert to "market-related" value of assets.
>
> The bill authorizes the State Treasurer to reduce the "normal contributions" of State and local employers to the systems, to the extent possible, from up to 100 percent of excess assets through FY 2002, and on a declining maximum percentage of excess thereafter. In addition, the bill permits the State to pay its unfunded accrued liabilities under the various pension systems from any source of funds, including the proceeds of pension obligation bonds (POBs) to be issued by the New Jersey Economic Development Authority (EDA).
>
> [Statement, Senate Bill No. 2148, *L.1997, c. 115.*]

*Jersey Sports & Exposition Auth., supra,* 61 *N.J.* at 25, 292 *A.*2d
545 ("The modern science of government has found a method of
avoiding [the debt limitation] clause, and the courts have approved
it. It is to create an autonomous public corporate entity to
undertake the task and to borrow money for the purpose on its
own bonds." (footnote omitted)); (2) the debt is dependent on a
"special fund" or separate revenue source for its repayment, *see,
e.g., Clayton v. Kervick,* 52 *N.J.* 138, 154, 244 *A.*2d 281 (1968)
(holding that the Educational Facilities Act did not violate the
debt limitation clause because repayment of the debt was intended
to come mainly from sources unrelated to legislative appropria-
tions and that its operations, therefore, "may be compared favor-
ably to the many self-liquidating projects which have been sus-
tained in our State and elsewhere"); and (3) there is no pledge on
the part of the state to repay the debt, *see, e.g., New Jersey
Turnpike Auth. v. Parsons,* 3 *N.J.* 235, 242, 69 *A.*2d 875 (1949)
(holding that bond issuance did not violate the Debt Limitation
Clause because the language of the statute negated any possibility
of the proposed bonds being debts of the State by providing that
the bonds of the authority "shall not be deemed to constitute a
debt or liability of the State ... or a pledge of the faith and credit
of the State").

The trial court here determined that the bonds do not violate
the Debt Limitation Clause because they were issued by an
independent agency and the explicit statutory language disclaimed
any obligation or liability on the part of the State regarding their
payment. What is not highlighted or even acknowledged by that
conclusion is that all of the other debt limitation cases contained
features that distinguish the current bond case. In other cases,
the independent authorities were clearly separate government
entities that served special and discrete governmental purposes.
*See Enourato v. New Jersey Building Auth.,* 90 *N.J.* 396, 448 *A.*2d
449 (1982) (State created Building Authority which issued bonds to
build and operate facilities for state agencies); *New Jersey Sports
& Exposition Auth., supra,* 61 *N.J.* 1, 292 *A.*2d 545 (State created
the Sports & Exposition Authority to issue bonds to bring about

the construction, operation and maintenance of a sports complex). Here, the EDA is functioning solely as a conduit to sell bonds. It is, in this context, a mere shell that serves no governmental function other than to issue the bonds for the State itself, becoming, in effect, a shield to insulate the State from being labeled a debtor. Furthermore, in other cases a separate source of income had been created by the independent authorities as a basis for funding their separate operations and fulfilling their specific public purposes. *See Clayton, supra,* 52 *N.J.* at 154, 244 *A.*2d 281 (rental payments to be made by various public and private colleges constituted separate source of income); *New Jersey Turnpike Auth., supra,* 3 *N.J.* at 238, 69 *A.*2d 875 (tolls and other revenues constituted separate source of income). Under the Bond Act, the EDA has no governmental function or purpose that requires funding as such, and no separate source of income is created to enable the EDA to repay the bonds.

Finally, the current bond issue is unlike any other previous bond issue because its purpose and its proceeds are directed only to defray the ordinary expenses entailed in the regular operation of government. In the past, debts incurred by the State in compliance with the Debt Limitation Clause have been debts that relate generally to governmental purposes distinct from the regularly recurring operations of the State. Previous bond issues have involved government purposes, such as major capital improvements, capital construction and the provision of special services. *See Enourato, supra,* 90 *N.J.* 396, 448 *A.*2d 449 (State created Building Authority, which issued bonds to build and operate facilities for state agencies); *Bulman v. McCrane,* 64 *N.J.* 105, 312 *A.*2d 857 (1973) (State contracted to have building constructed in return for its agreement to lease the building for twenty-five year term for use as a records storage center and printing facility); *Holster v. Board of Trustees of Passaic Cty. College,* 59 *N.J.* 60, 279 *A.*2d 798 (1971) (County College Bond Act enabled counties to issue bonds, the proceeds of which were to be devoted to capital outlays); *Clayton, supra,* 52 *N.J.* 138, 244 *A.*2d 281 (State created the New Jersey Educational Facilities Authority, which issued

bonds to construct projects for participating educational institutions); *New Jersey Turnpike Auth., supra,* 3 *N.J.* 235, 69 *A.*2d 875 (State legislature created the New Jersey Turnpike Authority which issued bonds to construct toll roads).

The Bond Act provides for the issuance of approximately $2.7 billion in bonds to generate moneys to pay for the accrued unfunded liability of various pension systems. The debt is created in order to meet current and future pension contributions. The provision of pensions for public employees is simply a part of the State's obligation to compensate its employees, and is clearly a regular function of government and an ordinary government operating expense. *E.g. City of Passaic v. Consolidated Police and Firemen's Pension Fund Comm'n,* 18 *N.J.* 137, 113 *A.*2d 22 (1955) (determining that a statute that required the State to contribute annually to a firemen and policemen's pension fund, did not thereby create State debt in order to meet a current operating expense, and therefore the statute was consistent with the Debt Limitation Clause because "[n]o debt [was] created ... rather[, the] present legislation merely provides that the State shall annually contribute to the fund.").

The trial court relied on *In re Loans of the New Jersey Property Liability Ins. Guaranty Ass'n,* 124 *N.J.* 69, 590 *A.*2d 210 (1991), to support its conclusion that the bonds at issue were not State obligations. There, the Court rejected a Debt Limitation Clause challenge to a financing structure created to pay off the debt of the New Jersey Automobile Full Insurance Underwriting Association ("JUA"). In that case, the Property Liability Insurance Guaranty Association ("PLIGA") was required to make a "loan" to the JUA in order to prevent the fund from becoming depleted. PLIGA contended that the payment violated the Debt Limitation Clause because the State would be responsible for repaying the "loan." The arrangement, however, was an integral part of the regulation of the insurance industry. The "loan" could have been as readily characterized as a transfer of monies between two insurance funds. Further, under the arrangement, the

contributions of insurers were a separate source of revenue direct-
ed to meet the claims of threatened policy holders. We thus
concluded that the replenishment of the PLIGA funds through the
repayment of those contributions or loans "fall within the types of
assurances of future payments that this Court has traditionally
found not to be 'debts.'" *Id.* at 77, 590 A.2d 210.

The apparent assumption underlying the Bond Act is that the
restrictions of the Debt Limitation Clause may be avoided merely
by the device of substituting an independent authority, rather than
the State, as the issuer of the debt, even though the authority has
no genuine independence or separate source of revenue and
marketability of the bonds rests entirely and exclusively on the
State's commitment to make the amortization payments as they
come due. Moreover, the availability of insurance, at a substantial
premium cost, compensates substantially for the credit worthiness
that a direct pledge of the State's credit would have achieved. If
the combination of an independent authority as issuer, together
with bond insurance, permits the State to avoid the Debt Limita-
tion Clause and market bonds as readily as if they were General
Obligation Bonds, why would any future Legislature or Governor
be inclined to comply with the constitutional limitation on debt?

Our precedents do not and should not permit the Debt Limita-
tion Clause to be so easily sidestepped. I believe that none of our
previous cases support the conclusion that the Bond Act has not,
in fact and in the constitutional sense, created a State debt. If the
State is permitted to incur debt in order to meet current operating
expenses, payable only from the State's general revenues, it is
hard to imagine any debt issuance by a state agency that would
run afoul of the Debt Limitation Clause. In evaluating the
validity of the bond issue under the Debt Limitation Clause, we
are enjoined to accord that provision the status that it deserves,
namely, that of an important structural provision in our Constitu-
tion. Its essential purpose is central to the constitutional struc-
ture of government. Its broad and fundamentally important
purpose of not binding future majorities to the financial policies of

current majorities must be construed with that overriding constitutional theme in mind. Under no circumstance should it be deflated or read out of the Constitution as a mere nuisance provision that serves no purpose except to define an administrative procedure for selling debt.

I concur in the Court's conclusion that events surrounding the issuance of the bonds have rendered the case essentially moot. "[F]or reasons of judicial economy and restraint, courts will not decide cases in which the issue is hypothetical, a judgment cannot grant effective relief, or the parties do not have concrete adversity of interest." *Anderson v. Sills,* 143 *N.J.Super.* 432, 437, 363 *A.*2d 381 (Ch.Div.1976). This appeal is not moot in the more traditional sense in that there is no case or controversy to adjudicate, but it is effectively or practically moot in the sense that it would be inappropriate for the Court to provide effective relief at this time. Whether based on the doctrine of mootness or laches, courts are reluctant to act when circumstances have changed such that the provision of judicial relief would be inequitable or otherwise inappropriate.

Plaintiff did not vigorously pursue this litigation. Plaintiff did not immediately appeal the trial court's decision, which was rendered on June 10, 1997, nor, significantly, did plaintiff seek an immediate stay of the court's order. Moreover, the State relied on a presumptively valid statute, which reliance was further justified by the decision of the trial court. The State certifies that substantial preparations were made for the sale of the bonds since the date of the trial court's decision: the EDA contracted with the underwriters, financial advisors, and bond counsel on June 10, potential investors were provided with a preliminary marketing statement on June 13, and the bonds themselves were premarketed to institutional investors on June 16. In addition, the State held meetings with potential investors throughout the week of June 16–20, 1997. The EDA adopted a resolution authorizing the issuance of the bonds on June 20; that same day, the EDA obtained insurance on the bonds. Also on June 20, the EDA

14

authorized the listing of the bonds on the Luxembourg Stock Exchange and the New York Stock Exchange. Indeed, the bonds themselves apparently were sold before the Court had an opportunity to decide whether to hear the appeal on the merits. *See* Brett Pulley, *Bond Issue in New Jersey Brings in $2.8 Billion,* *N.Y. Times,* June 26, 1997, at B5; Joe Donohue, *Investors Devour $2.76 Billion in Disputed Bonds, Star Ledger,* June 26, 1977, at 21. Although the Court could perhaps undo much of what the State has accomplished since the passage of the Bond Act, the many intricate and involved transactions undertaken by the State in reliance on the statute and the trial court's opinion and the certain prospect of substantial government disruption, in combination with the lateness of the appeal, would make judicial relief problematic.

*For moot*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI, and COLEMAN—5.

*Concur in part; dissent in part*—Justices HANDLER and STEIN—2.