NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3616-20

IN THE MATTER OF
PROPOSED CONSTRUCTION
OF COMPRESSOR STATION
(CS327), OFFICE BUILDING
AND APPURTENANT
STRUCTURES, HIGHLANDS
APPLICABILITY
DETERMINATION, PROGRAM
INTEREST NO.: 1615-17-0004.2
(APD200001).

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 31, 2023** |
| **APPELLATE DIVISION** |

Argued February 8, 2023 – Decided August 31, 2023

Before Judges Accurso, Firko and Natali.

On appeal from the New Jersey Department of
Environmental Protection.

Daniel Greenhouse argued the cause for appellants
Food & Water Watch, New Jersey Highlands
Coalition, and Sierra Club (Eastern Environmental
Law Center, attorneys; Daniel Greenhouse and
William D. Bittinger, on the briefs).

Jason Brandon Kane, Deputy Attorney General,
argued the cause for respondent New Jersey
Department of Environmental Protection (Matthew J.
Platkin, Attorney General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Jason Brandon
Kane, on the brief).

Richard G. Scott argued the cause for respondent Tennessee Gas Pipeline Company, LLC (Rutter & Roy, LLP, attorneys; Richard G. Scott, Christine A. Roy, and Monica N. Stahl, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

The sole question addressed on this appeal, one we've not had to decide before, is one of statutory interpretation.[1] The Department of Environmental Protection issued a Highlands Applicability Determination (HAD) to Tennessee Gas Pipeline Company, LLC exempting construction of a new compressor station in the Highlands Preservation Area from permitting review under N.J.S.A. 13:20-28(a)(11) (Exemption 11). Exemption 11 relieves a public utility from having to obtain a Highlands Preservation Area Approval for "routine maintenance and operations, rehabilitation, preservation, reconstruction, repair, or upgrade of public utility lines, rights of way, or

---

[1] Although the appellant in In re New Jersey Department of Environmental Protection Conditional Highlands Applicability Determination, Program Interest No. 435434, 433 N.J. Super. 223, 237 (App. Div. 2013), argued the Highlands Applicability Determination challenged in that case did not encompass a routine upgrade, and the DEP argued "the Legislature intended the word 'routine' to modify 'maintenance and operations' and not the other exempted activities," we found no need to resolve the question. We determined in that case "that, even if the exemption is interpreted as requiring that an upgrade be 'routine,'" the utility line upgrade at issue there could fairly be characterized as a routine one. Ibid. We do not find the case instructive here.

systems," so long as "the activity is consistent with the goals and purposes of" the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35. The Department issued the HAD without a determination as to whether the new compressor station qualifies as a "routine upgrade" to Tennessee's existing gas pipeline system because the DEP maintains "routine" in Exemption 11 modifies only "maintenance and operations" and does not modify "upgrade."[2]

Appellants Food & Water Watch, New Jersey Highlands Coalition, and Sierra Club have appealed the HAD,[3] contending we should apply the doctrine of noscitur a sociis, "an ancient maxim of statutory construction that the meaning of words may be indicated and controlled by those with which they are associated," Germann v. Matriss, 55 N.J. 193, 220 (1970), and find "the

[2] The HAD also refers to Exemption 11 in the Highlands Act Rules, which, as to the issue that concerns us, simply parrots the language of the statute. See N.J.A.C. 7:38-2.3(a)(11).

[3] Appellants initially failed to name Tennessee as a party. Tennessee filed a motion to intervene as of right, which we denied, and a motion for reconsideration and for permissive intervention, which we also denied. The Supreme Court granted Tennessee's motion for leave to appeal those orders and held "[b]ased on the role Tennessee played in obtaining this administrative relief from the NJDEP, Tennessee is an 'interested party' under Rule 2:5-1(d) [now Rule 2:5-1(b)(3)] and should have been included as a party in the Notice of Appeal and served accordingly." In re Proposed Constr. of Compressor Station (CS327), 250 N.J. 365, 368 (2022). The Court remanded the case to us "to permit appellants to file an amended Notice of Appeal and Case Information Statement that names Tennessee as an interested party pursuant to Rule 2:5-1[(b)(3)]." Ibid. Tennessee has since participated as a party "defendant" in this appeal.

word 'routine' not only modifies 'maintenance and operations' but also 'upgrade.'"  We agree with appellants the language of Exemption 11 and its statutory context, as well as the history of the Highlands Act, all point to the Legislature having intended to exempt only routine upgrades to a public utility's lines, rights of way or systems in the Preservation Area from the strictures of the statute.

Tennessee, however, only ever contended before the agency that its proposed new compressor station in the Preservation Area is an "upgrade" to its pipeline system.  And although counsel for the DEP asserted at oral argument the project could qualify as a "routine upgrade" entitling Tennessee to a HAD under Exemption 11, there is nothing in the agency record to indicate the Department ever considered the question, much less decided it. See In re Petition of Elizabethtown Water Co., 107 N.J. 440, 460 (App. Div. 1987) (noting "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that the action was based" (quoting Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943))). We thus vacate the HAD and remand for the DEP to consider whether Tennessee's proposed compressor station qualifies as a "routine upgrade" to its

pipeline system, entitling it to a HAD under our construction of the language of Exemption 11.[4]

We sketch only so much of the facts and procedural history as necessary to put our decision in context. Tennessee is a federally regulated natural-gas company that owns and operates a natural gas transmission system stretching northeastward from the Gulf states to New England. As part of its "East 300 Upgrade Project," Tennessee intends to install new compressor units in two existing compressor stations[5] along its "300 Line," one in Pennsylvania and one in Sussex County, and to construct a new station and appurtenant facilities in West Milford, in Tennessee's existing right-of-way on the site of a former quarry.

The new station would house a 19,000 hp-rated electric motor-driven compressor unit and connect to Tennessee's 300 Line pipeline just south of the

---

[4] We do not consider whether Tennessee qualifies as a public utility for purposes of qualifying for Exemption 11 as appellants only challenged Tennessee's status in their reply brief. See Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001).

[5] Tennessee asserts that "[c]ompressor stations, also known as pumping stations, compress natural gas by raising the pressure to 'push' gas through the pipeline." It explains the gas in the pipeline "enters a series of scrubbers and strainers, is compressed by the compressor, cooled and then continues through the pipeline until it is delivered to a customer or reaches the next compressor station."

station on the same site.[6]  Tennessee contends the East 300 Upgrade Project is necessary to "increase the capacity" of its existing pipeline system and "to respond to the request of" Consolidated Edison for 115,000 dekatherms per day of firm transportation capacity for its customers in Westchester County.

Because the proposed West Milford compressor station is located within the Highlands Preservation Area, the nearly 398,000-acre tract of the Highlands Region "subjected to stringent water and natural resource protection

---

[6]  In addition to the compressor building, Tennessee plans to construct a new 3,500-square-foot office building with potable water and a septic system, including a 1,000-gallon holding tank for waste, as well as a new 925-square-foot electrical building to house the variable frequency drive and motor control center for its compressor unit.  Tennessee also plans to install the following auxiliary equipment:

> (1) an electric motor ventilation system; (2) vent silencers; (3) gas coolers; (4) a lube oil cooler and piping; (5) filter separators; (6) an auxiliary building fitted with automation control panels; (7) an air compressor; (8) a 375-kilowatt emergency generator; (9) domestic fuel gas skid; (10) pipeline liquids storage tank; (11) building heaters; (12) mainline valve piping; and (13) suction, discharge, and vent piping.

Tennessee will also be building its own 69-kilovolt electrical substation on the site and constructing an electrical conduit from that electric substation to connect to an electric transmission line to be constructed by Orange and Rockland Utilities along Burnt Meadow Road, which borders the site. Tennessee estimates the cost of its East 300 Upgrade Project will be $246 million.  The West Milford compressor station is estimated to make up nearly $108 million of those costs.

standards, policies, planning, and regulation," N.J.S.A. 13:20-2; DEP Highlands Water Protection & Planning Act Guidance, State of N.J., https://www.nj.gov/dep/highlands/faq_info.htm (last visited Aug. 25, 2023), Tennessee submitted a HAD application to the DEP, seeking a determination that construction of its proposed West Milford station is exempt from the Highlands Act, and thus it was not required to obtain a Highlands Preservation Area Approval from the DEP for the project.

Appellants submitted public comments opposing Tennessee's application, asserting construction of the West Milford compressor station was "not routine maintenance or an upgrade of utility lines or systems, but a massive expansion of operations in the protected Highlands Region." They contended Tennessee was "building a new facility to push more gas through pipelines that go to New York" having "no public benefit for the people of" New Jersey.

The Highlands Council, which the DEP routinely consults when considering a HAD application, submitted a letter to the Department stating the Council had reviewed Tennessee's application and found construction of the compressor station "consistent with the goals of the Highlands Act." The Council noted Tennessee had sufficiently "avoided and minimized impacts to Highlands resources" by repurposing a "historically disturbed" former quarry

7

from which "[c]ritical wildlife habitat areas are disconnected and non-functional," and that it did not object to the DEP issuing Tennessee an exemption for the project.

The DEP determined construction of the West Milford compressor station "meets the definition of 'Major Highlands Development'" under N.J.A.C. 7:38-1.4, but the project was not "regulated by the Highlands Act" because it qualified for Exemption 11 and was consistent with the Water Quality Management Plan rules.[7] N.J.A.C. 7:38-2.4(a) and (e). In issuing the HAD, the Department did not state which one of the activities listed in Exemption 11 applied.[8]

---

[7] Appellants have also contended on appeal that the "DEP's determination that the proposed project is consistent with the [Water Quality Management Plan] is arbitrary and capricious" because the Department failed to "view the totality of the proposed project." Because we agree with appellants' first point that the Department has misinterpreted Exemption 11, necessitating a remand to the agency, we do not reach their second point.

[8] The Federal Energy Regulatory Commission (FERC), the agency that regulates Tennessee's facilities, rates, and types of service, subsequently granted Tennessee's application for a certificate of public convenience and necessity, finding Tennessee's plan "to install 300 feet of 36-inch-diameter unit piping and 1,400 feet of 42-inch-diameter suction and discharge piping connecting the compressor station to Tennessee's 300 Line" would "enable Tennessee to provide up to 115,000 [dekatherms] per day of firm transportation service, which constitutes 100% of the project's capacity, to ConEd," which had demonstrated "that natural gas demand in its service territories is exceeding its available firm natural gas interstate pipeline capacity and that additional transportation capacity is needed to serve its

As with any case in which we are called to interpret a statute, our "goal is to divine and effectuate the Legislature's intent." Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014) (quoting State v. Buckley, 216 N.J. 249, 263 (2013)). As "[t]here is no more persuasive evidence of legislative intent than the words by which the Legislature undertook to express its purpose," id. at 209-10, we look first to the plain language of the statute, giving the "words their ordinary meaning absent any direction from the Legislature to the contrary," TAC Assocs. v. N.J. Dep't of Env't Prot., 202 N.J. 533, 541 (2010), "and read them in context with related provisions so as to give sense to the legislation as a whole," DiProspero v. Penn, 183 N.J. 477, 492 (2005).

_____

existing and new customers." Tenn. Gas Pipeline Co., 179 F.E.R.C. ¶ 61,041, at ¶ 17 (2022). See 15 U.S.C. § 717f(c).

FERC denied Food & Water Watch's applications to stay construction pending appeal, Tenn. Gas Pipeline Co., 181 F.E.R.C. ¶ 61,051 (2022), and Food & Water Watch's challenge to FERC's approval of the project remains pending in the United States Court of Appeals for the D.C. Circuit, 179 F.E.R.C. ¶ 61,041, appeal filed, Nos. 22-1214 & 22-1315 (D.C. Cir. Dec. 13, 2022).

Appellants did not apply for a stay in this case, and we understand construction of the West Milford station is proceeding — at Tennessee's own risk, of course. See In re Request for Proposals #17DPP00144, 454 N.J. Super. 527, 575 (App. Div. 2018) (declaring nonconforming bidder "proceeded at its own risk" in assuming performance under the contract "in light of the significant, challenged deviation in its bid").

"If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over," and the court's job is done. TAC Assocs., 202 N.J. at 541 (alteration in original) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007)). But if the language is ambiguous and susceptible "to more than one plausible interpretation," DiProspero, 183 N.J. at 492, we turn to extrinsic aids to "effectuate the legislative intent in light of the language used and the objects sought to be achieved," Merin v. Maglaki, 126 N.J. 430, 435 (1992) (quoting State v. Maguire, 84 N.J. 508, 514 (1980)).

Our Supreme Court has long "adhere[d] to the canon of statutory construction that 'the general intention of a statute will control the interpretation of its parts.'" Waterfront Comm'n of N.Y. Harbor v. Mercedes-Benz of N. Am., Inc., 99 N.J. 402, 414 (1985) (quoting State v. Bander, 56 N.J. 196, 201 (1970)). Although we ordinarily accord substantial deference to an agency's interpretation of a statute the agency is charged with enforcing, no deference is required when "an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent."[9] In re N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J.

_____

[9] The DEP asserts that since Exemption 11 "was codified in DEP's rules, DEP has consistently interpreted the word 'routine' in Exemption #11 as only

10

331, 351 (1997). "Clear legislative intent cannot be trumped by countervailing administrative practices." Ibid.

In enacting the Highlands Act in 2004, the Legislature initiated an ambitious undertaking to protect the water and natural resources of the New Jersey Highlands, a nearly 800,000-acre area in the northwest part of the State "covering portions of 88 municipalities in seven counties," which provides clean drinking water to more than half the State's residents, against the environmental degradations of sprawl development. N.J.S.A. 13:20-2. Finding the then-existing land use and environmental regulation system inadequate to protect the region's resources, the Legislature mandated a comprehensive approach to land use planning, "complemented by increased standards more protective of the environment," to include identification of "a preservation area of exceptional natural resource value" for which the DEP would adopt "stringent standards governing major development." Ibid. It is thus beyond cavil that the Highlands Act represents "a comprehensive policy

_____
modifying 'maintenance and operations'" (citing 38 N.J.R. 5011(a) (Dec. 4, 2006) (response to comments 3 and 4)). That response, however, does not reflect the interpretation claimed, noting only "the exemption for the routine maintenance and operations of public utility lines at N.J.A.C. 7:38-2.3(a)11." 38 N.J.R. 5011(a) (response to comments 3 and 4). There is no mention of "upgrade." Ibid. As far as we are aware, the only time the Department has asserted "routine" does not modify "upgrade" was in Conditional Highlands Applicability Determination, Program Interest No. 435434, 433 N.J. Super. at 233.

11                                                              A-3616-20

designed to protect environmental interests," exemptions from which are to be strictly construed.  See M. Alfieri Co. v. State, Dep't of Env't Prot. & Energy, 269 N.J. Super. 545, 554 (App. Div. 1994).

The nub of the parties' dispute is whether an "upgrade of public utility lines, rights of way, or systems" must be "routine" in order to exempt the utility from the permitting requirements of the Highlands Act under Exemption 11 — which exempts entirely from all provisions of the Act and "any rules or regulations" adopted by the DEP pursuant to it:

> the routine maintenance and operations, rehabilitation, preservation, reconstruction, repair, or upgrade of public utility lines, rights of way, or systems, by a public utility, provided that the activity is consistent with the goals and purposes of this act.
>
> [N.J.S.A. 13:20-28(a)(11).]

Neither "routine" nor "upgrade" is defined in the statute.

Appellants argue the attributive adjective "routine" modifies each noun in the list, including "upgrade."  They contend their interpretation is supported by the absence of a semicolon after "maintenance and operations," which would indicate the Legislature's intent to separate "routine maintenance and operations" from the other activities in the Exemption, and by the interpretive maxim "noscitur a sociis" — literally:  "it is known from its associates."  Isetts v. Borough of Roseland, 364 N.J. Super. 247, 257 n.4 (App. Div. 2003).  They

12

also contend limiting the entire list of activities in the exemption to those of a routine nature best aligns with DEP's charge to implement "stringent standards governing major development," N.J.S.A. 13:20-2, in the Preservation Area and the goal of the regional master plan to "prohibit or limit to the maximum extent possible construction or development which is incompatible with preservation of this unique area," N.J.S.A. 13:20-10(b)(9).

The DEP and Tennessee counter that "routine" modifies only "maintenance and operations" as "'routine maintenance and operations' is set off from the rest of the list by a comma," and the disjunctive "or" before "upgrade" "signifies that each phrase is 'distinct and separate from each other,'" (quoting State v. N.T., 461 N.J. Super. 566, 571 (App. Div. 2019)). They argue "[t]he plain language of the exemption makes clear that upgrades to existing utility systems, provided that those upgrades are consistent with the goals and purposes of the Highlands Act, are exempt from the Highlands Act, NJDEP's implementing rules, and the Highlands Regional Master Plan." The DEP and Tennessee contend theirs "is the only interpretation that makes sense," because if "routine" modified "upgrade," then it would also modify "rehabilitation, preservation, reconstruction, [and] repair," which "would make no sense and thus would be an absurd interpretation."

Unfortunately, we do not find the "plain language" of Exemption 11 plain enough to resolve the parties' dispute. To the contrary, we find the language plainly susceptible to more than one interpretation. See DiProspero, 183 N.J. at 494. And although both sides present plausible constructions, we do not find them equally plausible. In our view, appellants have by far the better argument that the Legislature intended to limit the statutory exemption afforded public utilities to "routine" upgrades of their "lines, rights of way, or systems" in the Preservation Area in the same manner it does every other activity listed, that is "maintenance and operations, rehabilitation, preservation, reconstruction, [and] repair." N.J.S.A. 13:20-28(a)(11).

Although we think appellants have the better grammatical analysis, that is that the attributive adjective, otherwise known as the "prepositive modifier," "routine" modifies each noun in the list of exempt activities,[10] we do not "pin

---

[10] Antonin Scalia and Bryan A. Garner in their book Reading Law: The Interpretation of Legal Texts, 147 (2012), refer to this in their discussion of "Syntactic Canons" as the "Series-Qualifier Canon," that is "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." Among the examples they provide is this one: "[f]orcibly assaults, resists, opposes, impedes, intimidates, or interferes with — held, that forcibly modifies each verb in the list," id. at 148 (citing Long v. United States, 199 F.2d 717, 719 (4th Cir. 1952), in which the court determined "[t]he use of the adverb 'forcibly' before the first of the string of verbs, with the disjunctive conjunction used only between the last two of them, shows quite plainly that the adverb is to be interpreted as modifying them all").

heavy interpretive import" on the Legislature's choice of a comma over a semicolon here, Perez, 218 N.J. at 210; see 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 47.15 at 345 (7th ed. 2007) ("Punctuation is a most fallible standard by which to interpret a writing." (quoting Ewing's Lessee v. Burnet, 36 U.S. (11 Pet.) 41, 54 (1837))).[11]  Instead, we are guided by two interpretive principles — that "exception[s] to the provisions of a comprehensive statutory scheme. . . . are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law," Serv. Armament Co. v. Hyland, 70 N.J. 550, 558-59 (1976), and that "whatever the rule of [statutory] construction, it is subordinate to the goal of effectuating the legislative plan as it may be gathered from the enactment read in full light of its history, purpose, and context." Chasin v. Montclair State Univ., 159 N.J. 418, 426-27 (1999) (alteration in original) (quoting State v. Haliski, 140 N.J. 1, 9 (1995)).  Both point unerringly to the same result here.

---

[11]  We have no quarrel with State v. N.T., 461 N.J. Super. 566 (App. Div. 2019), the case relied on by the DEP and Tennessee, but find it inapplicable here.  In N.T., we held that portion of the expungement statute barring expungement of the records of a conviction for "[e]ndangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of the child, or causing the child other harm," N.J.S.A. 2C:52-2, referred to distinct harms based on the "comma and the word 'or.'"  461 N.J. Super. at 571.  The case did not address the treatment of an attributive adjective to a series of nouns in a list, the issue we address here.

No party disputes the manifest purpose of the Highlands Act is to reduce "the environmental impacts of sprawl development" in the Highlands Region by subjecting "major development" in the Preservation Area, which all agree the West Milford compressor station indisputably is, "to stringent water and natural resource protection standards, policies, planning, and regulation." N.J.S.A. 13:20-2.  One of the primary goals of the regional master plan for the Preservation Area is to "prohibit or limit to the maximum extent possible construction or development which is incompatible with preservation." N.J.S.A. 13:20-10(b)(9).  Because the Legislature plainly intended to subject major development in the Preservation Area to stringent regulation, we are compelled to interpret exemptions from the Act narrowly.  See M. Alfieri, 269 N.J. Super. at 554.

The main problem with the DEP and Tennessee's analysis from our perspective is that it is myopically focused on sentence structure, which we view as inconclusive, with no substantive analysis of the language of the exemption in light of the "history, purpose, and context" of the Highlands Act. Chasin, 159 N.J. at 427 (quoting Haliski, 140 N.J. at 9).  That is, they fail to analyze or consider the meaning of "upgrade" with reference to the Act or to the other words with which it is associated in the exemption — those from which it should naturally gather meaning.  See Jarecki v. G. D. Searle & Co.,

16                                                      A-3616-20

367 U.S. 303, 307 (1961).  Looking at the statute from that perspective reveals that failing to allow "routine" to modify "upgrade" makes "upgrade" the odd item out in the list of "maintenance and operations, rehabilitation, preservation, reconstruction, repair, or upgrade," leaving "upgrade" alone with no implied limiting principle.  N.J.S.A. 13:20-28(a)(11).

As in a verbal reasoning test that asks which item in a list of apple, orange, cheese, and chalk is unlike the others, "upgrade" without the modifier "routine" is unlike every other activity in the list of exemptions.  An electric utility might, for example, "upgrade" its transmission lines by moving from aluminum and steel conductor cores to carbon fiber or "upgrade" a coal-fired plant by replacing it with a nuclear reactor.  Both would readily qualify as "upgrades," although they are obviously of a vastly different character.  To understand the sense in which the Legislature used "upgrade," we need to look to its statutory context, and particularly to the words "with which [it is] associated."  Germann, 55 N.J. at 220.

The maxim noscitur a sociis, explained by the United States Supreme Court to mean "a word is known by the company it keeps," Jarecki, 367 U.S. at 307, "while not an absolute rule, serves as 'a helpful guide in ascertaining the intended scope of associated words or phrases,'" Isetts, 364 N.J. Super. at 257 (quoting Germann, 55 N.J. at 221).  As other courts have noted, the maxim is

17                                                                    A-3616-20

"wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" to acts of the Legislature. Ibid. (quoting Jarecki, 367 U.S. at 307). Its application is particularly appropriate here, as we are construing the words of "an exemption from a comprehensive policy designed to protect environmental interests," M. Alfieri, 269 N.J. Super. at 554, which we are bound to interpret narrowly. The canon cautions us to take care against interpreting "upgrade" in a way that would give it a broad scope unintended by the Legislature.

Applying it here by allowing "routine" to modify "upgrade" makes upgrade consistent with the other activities included in the exemption. It removes "upgrade" from the status of an outlier and makes it consonant with "maintenance and operations, rehabilitation, preservation, reconstruction, [and] repair," N.J.S.A. 13:20-28(a)(11), powerful evidence in our view of the Legislature's intended scope of the word. See Scalia & Garner, Reading Law: The Interpretation of Legal Texts 195 ("When several nouns or verbs or adjectives or adverbs — any words — are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar.").[12] Harkening back to our

---

[12] Scalia and Garner include noscitur a sociis in their discussion of "Contextual Canons," referring to it as the "associated-words canon," that is

electric utility example, allowing "routine" to modify "upgrade" would plainly differentiate the upgrade of the transmission wires from the upgrade of the coal-fired plant, although we do not mean to suggest an opinion on whether either would be appropriate for the Preservation Area.

In that regard, we reject the Department and Tennessee's contention that the limiting principle the Legislature imposed on the activities included in Exemption 11, including "upgrade," is not that they qualify as "routine," but that all must be consistent with the goals and purposes of the Highlands Act.

The Legislature has, to be sure, required the entire list of activities included in Exemption 11 to be "consistent with the goals and purposes" of the Highlands Act, N.J.S.A. 13:20-28(a)(11), but that is the case regardless of whether "routine" modifies every activity listed or only "maintenance and operations." Because any activity undertaken by a public utility in the Preservation Area with regard to its "lines, rights of way, or systems" must be "consistent with the goals and purposes" of the Highlands Act in order to be

_____
"[a]ssociated words bear on one another's meaning." Scalia & Garner, Reading Law: The Interpretation of Legal Texts 195.

exempt from the Act's requirements, <u>ibid.</u>, the proviso does not speak to the question of whether the Legislature intended "routine" to modify "upgrade."[13]

We fail to grasp — and neither the Department nor Tennessee explains — why "routine" modifying every listed activity, that is to read the statute to exempt only routine maintenance and operations, routine rehabilitation, routine preservation, routine reconstruction, routine repair, and routine upgrade, "would make no sense and thus would be an absurd interpretation," as they assert.

"Routine" is plainly intended to serve as a statutory limiting principle of the enumerated activities a utility may undertake in the Preservation Area with regard to its lines, rights of way, and systems without the DEP engaging in a permitting review. And although all the activities included in the list other than "upgrade" have implied limitations, "maintenance and operations" being

---

[13] That point is easily illustrated by again considering our electric utility example and the issue before us. It is obvious a nuclear power plant would not be a "routine" upgrade of a coal-fired plant or consistent with the goals and purposes of the Highlands Act. It is considerably less clear, at least on this record, whether the construction of a new compressor station in the Preservation Area, which the Department deemed "consistent with the goals and purposes of the Highlands Act," a determination we do not reach, could also qualify as a "routine" upgrade of Tennessee's gas pipeline system. The questions are simply independent of one another.

A-3616-20

the most obvious,[14] we do not find it absurd, or indeed even odd, for the Legislature to have exempted only routine rehabilitation, preservation, reconstruction, repair and upgrades from the permitting requirements of the Act in the same manner it exempted only routine maintenance and operations, given the Legislature's avowed goal to subject "major development" in the Preservation Area "to stringent water and natural resource protection standards, policies, planning, and regulation." N.J.S.A. 13:20-2. In no way could the interpretation be regarded as one leading to an "absurd" result consistent with our case law. See, e.g., Robson v. Rodriquez, 26 N.J. 517, 528-29 (1958) (holding it "absurd" to interpret the Unsatisfied Claim and Judgment Fund Law to deny an uninsured person recovery from the Fund but allow her personal representative to recover if the uninsured person died before filing suit, even from a cause unrelated to the accident).

The Court has instructed "[t]he true meaning and intention of legislation must be derived from the whole and not from any single component part," lest

---

[14] Indeed, reading "routine" to modify only "maintenance and operations" is much closer to an "absurd" interpretation of the statute. Of all the activities on the list, "maintenance and operations" most clearly implies "routine" activity, resulting in use of the modifier adding nothing to its meaning. See Long, 199 F.2d at 719. In interpreting a statute, we, of course, "endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage." DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 307 (2005).

"distortion . . . result." Denbo v. Twp. of Moorestown, 23 N.J. 476, 481 (1957). It reminds that "[i]n enacting legislation the lawmakers are deemed to have had a definite purpose in mind, and to have included the component parts of the enactment to accomplish that purpose." Ibid.

The Legislature announced its purpose in enacting the Highlands Act in ringing tones, declaring the Highlands' "exceptional natural resources" in the form of clean drinking water, "clean air, contiguous forest lands, wetlands, pristine watersheds, and habitat for fauna and flora" were "at serious risk of being fragmented and consumed by unplanned development," and "because of [the Highlands'] vital link to the future of the State's drinking water supplies and other key natural resources," it was essential "that the State should take action to delineate within the New Jersey Highlands a preservation area . . . where stringent protection policies should be implemented." N.J.S.A. 13:20-2.

Guided by the Legislature's express declaration "that it is in the public interest of all the citizens of the State" that the Preservation Area be subject "to stringent water and natural resource protection standards, policies, planning, and regulation," ibid., we cannot accept the Department and Tennessee's position that the Legislature intended Exemption 11 for "the routine maintenance and operations, rehabilitation, preservation, reconstruction, repair, or upgrade of public utility lines, rights of way, or

systems" in the Preservation Area to exempt any upgrade a utility might propose and, specifically, to exempt Tennessee's construction of a new compressor station and appurtenant facilities, including its own electric substation, at a cost of over $100 million with no showing it constituted only a "routine upgrade"[15] of its gas pipeline system. Neither the language and structure of the Exemption nor the history and purpose of the Highlands Act support that result.

We accordingly vacate the HAD issued to Tennessee and remand the matter to the Department for further proceedings not inconsistent with this opinion, including but not limited to consideration of whether Tennessee's proposed compressor station can qualify as a "routine upgrade" to its pipeline system. We do not retain jurisdiction.

Vacated and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[15] The parties dispute the meaning of a "routine upgrade" and whether it relates to a utility's "need to expand" existing utility services, as perhaps implied in Conditional Highlands Applicability Determination, Program Interest No. 435434, 433 N.J. Super. at 237, or whether it is instead related to "whether the project is a 'system' upgrade" in accordance with Exemption 11 and the DEP's rules, requiring assessment of "environmental impacts." As we are not bound by the decision of another panel of this court, Brundage v. Est. of Carambio, 195 N.J. 575, 593 (2008), and the issue is not squarely before us, we express no opinion on this point, deeming it a question for the Department in the first instance.

A-3616-20